UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                                       :
CHRISTOPHER DEMARKEY                                    :          3:19 CV 711 (RMS)
                                                       :
V.                                                     :
                                                       :
ANDREW SAUL,                                            :
COMMISSIONER                                            :
OF SOCIAL SECURITY[1]                                  :          DATE: MAY 4, 2020
                                                       :
------------------------------------------------------ x

<u>RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks

review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff

disability insurance benefits ["SSDI"].

I.        ADMINISTRATIVE PROCEEDINGS

On January 20, 2017, the plaintiff filed an application for SSDI, claiming that he had been

disabled since December 19, 2016, due to traumatic brain injury, a knee injury, depression, and

acne.  (*See* Certified Transcript of Administrative Proceedings, dated March 27, 2019 ["Tr."] 64-

65, 232-33). The plaintiff's application was denied initially and upon reconsideration. (Tr. 110-13,

116-19).  On January 18, 2018, a hearing was held before Administrative Law Judge ["ALJ"]

Matthew Kuperstein, at which the plaintiff and a vocational expert testified.  (Tr. 30-94; *see* Tr.

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security.  (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. P. 25(d).  The Clerk of the Court shall amend the caption in this case as indicated above.

120-21).[2] On November 26, 2018, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 11-24). On December 21, 2018, the plaintiff requested review of the ALJ's decision (Tr. 226-29), and on March 15, 2019, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On May 10, 2019, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on May 31, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 10). This case was transferred accordingly. On September 10, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 13), with a brief (Doc. No. 13-2 ["Pl.'s Mem."]), and Statement of Material Facts (Doc. No. 13-1) in support.  On November 12, 2019, the defendant filed his Motion to Affirm with brief (Doc. No. 14-1 ["Def.'s Mem."]) and a Statement of Material Facts (Doc. No. 14-2) in support.

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is GRANTED, and the defendant's Motion to Affirm (Doc. No. 14) is DENIED.

## II.    FACTUAL BACKGROUND

At the time of his hearing in November 2018, the plaintiff was thirty-six years old and was living alone in an apartment which he paid for through money he received from a trust fund. (Tr. 37, 39-40). The plaintiff testified that he had a traumatic brain injury and post-traumatic stress disorder ["PTSD"], and when he concentrated, his vision blurred. (Tr. 38, 40).  He had daily flashbacks that were sometimes mild and sometimes violent, and when he got "stressed[,]" he just "shut down."  (Tr. 47-48).   In an average month, he did not get out of bed about six of those days.

---

[2] Initially, the hearing was scheduled for May 2, 2018 (Tr. 138, 160), but the plaintiff failed to appear (Tr. 164), and his request for hearing was dismissed. (Tr. 99-103).  The plaintiff's counsel filed a request for review (Tr. 167-72), and the Appeals Council remanded the case to the ALJ for further action.  (Tr. 176-78).  The hearing was held November 14, 2018. (*See* Tr. 191, 198, 217, 220).

(Tr. 49). Some days he could not leave the house because he was "so scared." (Tr. 50). He attended Alcoholics Anonymous meetings and church. (Tr. 43). At that time, he had been sober since May 22, 2012. (Tr. 50). He watched news shows on television during the day. (Tr. 44-45).

The plaintiff testified that his previous job as a "rehab specialist" involved making sure that the patients took their medications and that no crises happened. (Tr. 53). He stopped working because he was fired for "improper conduct[.]" (Tr. 271).

The vocational expert classified this past work as a "social services aide" performed at light exertion. (Tr. 54). When presented with a hypothetical of an individual capable of light work, but who could never climb ladders, ropes or scaffolds, could occasionally climb stairs and ramps, could occasionally balance, stoop and crouch, but never kneel or crawl, and could perform simple, routine, repetitive tasks, sustain concentration, pace and persistence for two-hour segments, with brief and superficial interaction with coworkers and no interaction with the public, and little to no changes in duties in routines, the vocational expert testified that such a person could not perform the plaintiff's past work, but could perform the work of a garment folder, "assembler, dry and cell battery[,]" and, shirt presser. (Tr. 54-58).

The vocational expert further explained that, if a person had the same limitations detailed above but could stand and walk for up to four hours and could sit for up to six hours, the number of jobs available would be reduced by fifty percent. (Tr. 58). If such an individual could not sustain concentration, pace and persistence for two-hour segments or, alternatively, would be off task at least fifteen percent of the workday, that individual could not perform the work identified by the vocational expert. (Tr. 59).

3

III.   THE ALJ'S DECISION

Following the five-step evaluation process,[3] the ALJ found that the plaintiff met the insured

status requirements through December 31, 2021 (Tr. 16) and had not engaged in substantial gainful

activity since December 19, 2016, the alleged onset date. (Tr. 16, citing 20 C.F.R. § 404.1571 *et*

*seq.*).

At step two, the ALJ found that the plaintiff had the following severe impairments:

traumatic brain injury, depressive disorder, anxiety disorder, and PTSD. (Tr. 16, citing 20 C.F.R.

§ 404.1520(c)).

The ALJ concluded at step three that the plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of the listed impairments

in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16-18, citing 20 C.F.R. §§ 404.1520(d),

404.1525 and 404.1526). He concluded that the plaintiff had the residual functional capacity

["RFC"] to perform light work as defined in 20 C.F.R. § 404.1567(b), except with the further

limitations that

> [h]e [could] stand and walk for [four] hours and sit for [six] hours; [could] never
> climb ladders, ropes, or scaffolds and occasionally climb ramps and stairs; [could]
> never kneel or crawl and occasionally balance, stoop, and crouch; [could] perform
> simple, routine, repetitive tasks; [could] sustain concentration, persistence, and

---

[3] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a).  If the claimant is currently employed, the claim is denied.  *Id.*  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998).  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

pace for [two]-hour segments; [could] have brief and superficial interaction with co-workers and no interaction with co-workers and no interaction with the public; [could] perform work with little or no changes in duties and routines; [could] work in an environment where he does not exercise independent judgment, such as setting duties or schedules for others or being responsible for the safety of others; and [could not] perform work at assembly production rate.

(Tr. 18).

The ALJ concluded that the plaintiff was unable to perform any of his past relevant work (Tr. 23, citing 20 C.F.R. § 404.1565), but he retained the RFC to perform the work of a garment folder, assembler of dry and cell batteries, and a shirt presser. (Tr. 24, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from December 9, 2016, through the date of his decision. (Tr. 24, citing 20 C.F.R. § 404.1520(g)).

IV.    STANDARD OF REVIEW

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d. Cir. 2012) (citation & internal quotation marks omitted); *see* 42 U.S.C. § 405(g). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation & internal quotation marks omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation & internal quotation marks omitted). Upon review, is not the court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the

Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff argues that the ALJ failed to develop the record in that there was no medical evidence for the eight months prior to his hearing, the employment evaluation conducted by the Bureau of Rehabilitation Services ["BRS"] was not in the record, there was no evidence concerning the plaintiff's car accident, hospitalization, and rehabilitation, and there were mental health records absent from the administrative record.  (Pl.'s Mem. at 7-8).  The plaintiff also claims that the ALJ erred in the weight he assigned to the medical opinions of record (Pl.'s Mem. at 9-16), and the ALJ erred in his description of the plaintiff's RFC.  (Pl.'s Mem. at 16-20).  The Court will address the plaintiff's arguments as they relate to each step of the sequential analysis.

A.    DUTY TO DEVELOP THE RECORD

On appeal, this Court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Moran*, 569 F.3d at 112 (citation & internal quotations omitted).

A "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted).  This duty exists even when, as in this case, the claimant is represented by counsel.  *Id.* (citation omitted); *see also Burgess*, 537 F. 3d at 128. The issue of whether an ALJ has satisfied his obligation to develop the record is one that "must be

addressed as a threshold issue." *Downes v. Colvin*, No. 14 CV 7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015).   The ALJ's obligation to develop the record exists "when additional information is needed due to the vagueness, incompleteness, or inconsistency of the treating source's opinion." *Moreau v. Berryhill*, No. 3:17 CV 396 (JCH), 2018 WL 1316197, at *11 n.6 (D. Conn. Mar. 14, 2018) (multiple citations omitted); *see* 20 C.F.R. § 404.1520b(b)(2)(i).

The defendant asserts that Dr. Graham's treatment records and medical opinions "are internally inconsistent[,]" (Def.'s Mem. at 11 (citing Tr. 506-08, 531-33, 561-62)), but then contends that the inconsistencies are the precise reason the ALJ did not err in assigning little weight to his opinions. Specifically, the ALJ assigned Dr. Graham's opinions "little weight" because the ALJ concluded that Dr. Graham's findings that the plaintiff had problems sustaining concentration and attention or performing simple tasks at a reasonable pace contrasted with clinical findings in Dr. Graham's medical records. (Tr. 22). Here, the ALJ had two neurological consultative opinions, two psychological consultative examination opinions, and the treatment records and three medical source statements from the plaintiff's treating psychiatrist.   Thus, the record was "adequate for [the ALJ] to make a determination as to disability."   *Perez*, 77 F.3d at 48.

The error, however, lies in the ALJ's treatment of the opinions in the record.   As explained below, the ALJ rejected Dr. Graham's opinions because he found them to be internally inconsistent, yet the ALJ relied on selected entries in records not authored by Dr. Graham and ignored several consistent entries within Dr. Graham's records.   Dr. Graham is the plaintiff's treating provider; he authored three medical opinions, one of which the ALJ did not even reference in his decision.   The ALJ's rejection of Dr. Graham's opinions led to an RFC determination that was not supported by the record.[4]

---

[4] Specifically, when the ALJ posed the limitations identified by Dr. Graham to the vocational expert, namely, if such an individual could not sustain concentration, pace and persistence for two-hour segments or alternatively, would be

B.    THE ALJ ERRED IN HIS CONSIDERATON OF THE MEDICAL OPINIONS OF THE RECORD

The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  *Burgess,* 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]).   Only "acceptable medical sources" can provide medical opinions and are considered treating sources whose opinions are entitled to controlling weight.  *See* 20 C.F.R. §§ 416.927(a)(2), (c).

When the ALJ "do[es] not give the treating source's opinion controlling weight," as happened here, he must "explicitly consider" the factors listed in 20 C.F.R. § 404.1527(c)(2), including "'(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."' *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam)). Unless after "'a searching review of the record'" the reviewing court is "assure[d] . . . that the 'substance of the treating physician rule was not traversed,'" the ALJ's failure to apply these factors requires the remand.  *Estrella*, 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).  In this case, the ALJ failed to properly apply these factors.

The treating provider opinions at issue in this case are the three medical source statements authored by Dr. Graham, the plaintiff's treating psychiatrist. A psychiatrist is an acceptable medical source under the Social Security Administration regulations. 20 C.F.R. § 404.1502(a)(1).

---

off task at least fifteen percent of the workday, the vocational expert testified that such an individual could not perform the work that he identified.  (Tr. 59).

The ALJ appropriately referred to Dr. Graham as a medical doctor, but then rejected his opinions because, according to the ALJ, Dr. Graham treated the plaintiff for "only a brief [two]-month period of time" before making his assessments.  (Tr. 22).

The ALJ did not err in discounting the first opinion of Dr. Graham based on the short treatment history at that time, but Dr. Graham authored two more opinions, the last of which was written seven months into treatment.  The ALJ does not reference that final opinion in his decision. The ALJ's failure to explicitly consider the length, nature and extent of the treatment with Dr. Graham is "procedural error."  *Estrella*, 925 F.3d at 96.  The Court's inquiry does not end here, however, as it "must determine if 'the substance of the treating physician rule' was 'traversed' by examining whether the ALJ provided 'good reasons' for his weight assignment." *Lee v. Saul*, No. 5:19 CV 136 (BKS), 2020 WL 563430, at *9 (N.D.N.Y. Feb. 5, 2020) (quoting *Estrella*, 925 F.3d at 96).

In this case, the ALJ assigned "little weight" to two of Dr. Graham's opinions and failed to reference Dr. Graham's third opinion, authored seven months into treatment. (Tr. 22). As a treating physician, Dr. Graham's opinions were entitled to controlling weight unless the ALJ explicitly articulated why the medical evidence did not support the opinion and why the opinion was not consistent with the medical evidence in the record.  *See Estrella*, 925 F.3d at 95; *see Burgess*, 537 F.3d at 128.  In his decision, the ALJ explained that Dr. Graham's opinions were not entitled to controlling weight because "[r]ecords from Kenneth Graham detail[ed] that the claimant had intact concentration, liner thought process, and independent functional capacity."  (Tr. 20; *see* Tr. 512).  In making this finding, the ALJ relied on a May 1, 2017 record from Helen Collins, LSCW, not a treatment record from Dr. Graham. (Tr. 20; *see* Tr. 512). Indeed, none of the other references that the ALJ relied upon to discredit Dr. Graham's medical source statements, were

authored by Dr. Graham.  (Tr. 20).  The ALJ relied instead on Collins's records for his conclusion that the plaintiff had no racing thoughts, was not easily distracted, had no paranoid ideations, had a fair energy level, had no social isolation, and had an improved mood.  (Tr. 20, 22; *see* Tr. 579, 592, 675).  Additionally, the ALJ's reliance on these entries to the exclusion of the references to the plaintiff's limitations in both Dr. Graham's and Collin's treatment records represents a classic case of impermissible "cherry picking."[5]

The plaintiff received consistent medication management from Dr. Graham, as well as individual therapy, and he underwent several consultative examinations in connection with this application for benefits.  Yet, the ALJ assigned "little weight" to Dr. Graham's opinions on the ground that his medical opinions were not supported by his treatment notes.  Additionally, the plaintiff underwent consultative examinations with Dr. Slutsky and Dr. Cohen, both of whom noted limitations consistent with those identified by Dr. Graham.

The ALJ assigned "little weight" to Dr. Graham's findings that the plaintiff had problems sustaining concentration and attention or performing simple tasks at a reasonable pace because, according to the ALJ, such opinions contrasted with clinical findings in Dr. Graham's medical records. (Tr. 22). The consideration of these limitations is particularly important in light of the vocational expert's testimony that, if an individual could not sustain concentration, pace and persistence for two-hour segments or alternatively, would be off task at least fifteen percent of the workday, that individual could not perform the work identified by the vocational expert.  (Tr. 59).  Similarly, the ALJ did not credit the plaintiff's allegations that he had "very little ability to sustain

---

[5] "The term 'cherry picking' generally refers to 'improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source . . . . The fundamental deficiency involved with 'cherry picking' is that it suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both . . . .'" *Rodriguez v. Colvin*, No. 3:13 CV 1195(DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016) (quoting *Dowling v. Comm'r of Soc. Sec.*, No. 5:14–CV–0786 (GTS)(ESH), 2015 WL 5512408, at *11 (N.D.N.Y. Sept. 15, 2015) ( additional citations omitted)).

focus for work tasks[,]" and that he had PTSD flashbacks. (Tr. 20). The ALJ also concluded that none of the records detailed a loss of concentration or focus. (Tr. 20). To the contrary, Dr. Graham and the consultative examiners repeatedly noted the plaintiff's PTSD flashbacks and his limitation in sustaining concentration.

The medical opinions of record began with a Disability Evaluation performed by Dr. Slutsky on March 8, 2017, in connection with the plaintiff's application for benefits. (Tr. 372-74). The plaintiff reported that he suffered a traumatic brain injury in 1997 when, at age fifteen, he was hit by a motor vehicle while running from a group of bullies; he was hospitalized for approximately three months and underwent rehabilitation at various facilities for several months thereafter. (Tr. 372). According to the plaintiff, he had decreased comprehension, it was difficult for him to follow directions, he had problems keeping track of the order of instructions, he needed assistance and accommodation in order to do so, and he forgot items when he went to the grocery store. (*Id.*). These limitations in comprehension and in his ability to follow directions were captured by the plaintiff's treating physician's records as well.

Dr. Slutsky found that the plaintiff had weakness in his left upper and lower extremities, as well as diminished fine motor skills, and it was difficult for him to use a fork in his left hand or to pick up objects, such as coins, off a table. (*Id.*). He had significant problems using a keyboard with his left hand, and left leg weakness caused him to feel off balance, but he did not use a cane. (*Id.*). It was difficult for him to walk up and down stairs. (*Id.*).

Dr. Slutsky performed a neurologic examination, which revealed normal right-side motor strength but reduced left side arm, hand, leg, and foot strength. (Tr. 374). The plaintiff could perform a finger to nose maneuver on the right but not on the left side. (*Id.*). His right heel to left shin maneuver was "well done, but his left heel to right shin [was] poorly done." (*Id.*). Dr. Slutsky

observed that the plaintiff had no difficulty getting on and off the examination table, and he had full ranges of motion in his extremities, intact sensation, and normal joints. (Tr. 373). Based on this examination, Dr. Slutsky opined that the plaintiff had ongoing neurocognitive deficits that included diminished comprehension, poor ability to follow task ordering, and directions, left sided weakness, and poor fine motor skills. (Tr. 374).

Eight months later, on November 9, 2017, the plaintiff underwent an updated consultation examination with Dr. Slutsky who noted, upon the plaintiff's report, that the plaintiff had poor balance when he ambulated and would suddenly lose his balance four or five times daily. (Tr. 555). He did not have a cane, and he did not have a history of falls. (*Id.*). His left knee was still weak, and it contributed to the plaintiff's poor balance. (*Id.*).

On physical examination, Dr. Slutsky found a slight atrophy of the left side and lower leg muscles, and significant hypertrophic changes of soft tissue swelling of the left knee. (Tr. 557). Additionally, there was mild tenderness of the patellar region. (*Id.*). He had full range of motion and no instability. (*Id.*). Additionally, he had excellent motor strength bilaterally and intact sensation, as well as normal reflexes. (*Id.*). Dr. Slutsky concluded that the plaintiff had ongoing neurocognitive, psychological, and psychiatric issues as a result of his accident. (*Id.*). He had a history of left knee surgery from a torn ACL with ongoing pain and weakness in that knee. (*Id.*).

The ALJ accepted Dr. Slutsky's opinion that the plaintiff had "some issues with his knees and might [have] some limitations in his ability to stand and walk," which he accounted for in his RFC. (Tr. 21). Yet, the ALJ assigned "limited probative value" to the first report from Dr. Slutsky because "it [did] not provide very specific findings as to the claimant's ability to lift, carry, stand, and walk." (Tr. 21). Dr. Slutsky, however, performed neurological tests before reaching his conclusions about the plaintiff's limitations. Moreover, his findings were consistent with the State

agency opinions that the plaintiff should avoid all exposure to hazards because they would cause him to feel off-balance due to left lower extremity weakness. (Tr. 73).

The ALJ acknowledged that the plaintiff had limitations due to his knee impairment (*see* Tr. 22 (the ALJ rejected the State agency opinion that the plaintiff could stand and walk for six hours and that he could perform medium work because there were "lingering issues with his knees.")); thus, to the extent that the ALJ rejected Dr. Slutsky's opinion because it lacked specific findings, the ALJ had a duty to obtain clarification of the medical source statement. *Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) (summary order) (remanding when the medical records obtained by the ALJ did not "shed any light on [the claimant's] [RFC]" particularly when it was "unclear from the record that such a request [from the ALJ for this information] was even made.").

Additionally, the ALJ found that Dr. Slutsky's conclusion that the plaintiff had reduced comprehension and poor ability to follow tasks "lack[ed] any supporting clinical findings." (Tr. 21). However, not only were these conclusions based on a neurologic examination performed by a physician, they were consistent with the subsequent treatment records from the plaintiff's treating provider.

Two months after Dr. Slutsky's initial consultative examination, the plaintiff began psychoactive medication management with Dr. Graham, a psychiatrist. (Tr. 480, 522, 540). At his first visit, on May 16, 2017, Dr. Graham noted that the plaintiff had anxiety, panic attacks, agoraphobia, depression and sleep problems that were "[s]ignificant[,]" decreased functioning ability, and disturbing or unusual thoughts and flashbacks of being hit by a car. (Tr. 480, 522, 540). The plaintiff denied any inability to cope with his daily activities. (*Id.*). He was prescribed Sertraline and Trazadone. (*Id.*). The plaintiff returned on May 30, 2017, at which time his anxiety

and depression were "[m]oderate to [s]evere."  (Tr. 524, 542).  He had insomnia, loss of pleasure, decreased functioning ability, disturbing unusual thoughts, feelings, or sensations, flashbacks of nightmares, unreasonable or irrational fears "with a compelling desire to avoid[,]" and increased limitation of normal activities. (*Id.*).  His prescription doses were increased.  (*Id.*).

On June 5, 2017, Dr. Graham completed his first medical source statement in which he wrote that the plaintiff was first seen on May 16, 2017 for unspecified mood disorder. (Tr. 505). In the brief time that he had treated the plaintiff, he saw limited improvement. (*Id.*). The plaintiff had flashbacks of his auto accident, and a depressive, anxious, and constricted affect. (Tr. 506). He had a "[f]requent[]" problem or "[l]imited ability" using appropriate coping skills, handling frustration, carrying out multi-step instructions, focusing long enough to finish simple tasks or activities, and persisting in simple activities without interruption from psychological symptoms; he "sometimes" had a problem or a "[r]educed ability" in carrying out single step instructions, changing from one simple task to another, and performing basic activities at a reasonable pace. (Tr. 507).  Dr. Graham opined that the plaintiff's anxiety and depression impaired his coping skills and frustration tolerance and impaired his ability to carry out instructions and complete tasks. (Tr. 507-08). Additionally, Dr. Graham assessed the plaintiff's judgment as "fair" and noted that the plaintiff was a reliable informant. (Tr. 506).

The ALJ appropriately considered the length of Dr. Graham's treatment relationship with the plaintiff, which, at the time this medical statement was completed, was only two months. *See* 20 C.F.R. § 404.1527(c)(2)(1); *Estrella*, 925 F.3d at 95. However, the ALJ err in rejecting Dr. Graham's opinions as inconsistent with the treatment records when, in fact, the medical record contained multiple consistent entries that the ALJ ignored.

Specifically, when the plaintiff returned to Dr. Graham on June 13, 2017, his anxiety and depression remained significant (Tr. 544, 526), and, while his speech and cognitive functioning were normal, Dr. Graham reported that the plaintiff had a loss of pleasure, decreased functioning ability, and disturbing or unusual thoughts, feelings, and sensations, still with flashbacks. (*Id.*). His Sertraline and Trazadone were increased, and he was diagnosed with chronic PTSD. (Tr. 545, 527).

The plaintiff saw Dr. Graham again on June 28, 2017. (Tr. 528-29, 546-47, 632-33). He had anxiety with persistent worry, as well as a moderate degree of depression. (Tr. 528, 546, 632). His sleep was a significant problem, and he continued to have a loss of pleasure, decreased functioning ability, and disturbing or unusual thoughts, feelings, or sensations, with flashbacks. (*Id.*). He was compliant with his medication. (*Id.*).

On July 6, 2017, Dr. Graham completed a second medical source statement in which he opined to the same limitations as were in his June 5, 2017 statement. (*Compare* Tr. 530-34 *with* Tr. 505-08). A week later, the plaintiff returned to Dr. Graham. (Tr. 548-49, 626-27, 743-44). Though he had no improvement in his anxiety or depression, he did have improvement in his sleep. (Tr. 548, 626, 743). Again, he had loss of pleasure, decreased functioning ability, and disturbing or unusual thoughts, feelings, or sensations, and flashbacks. (*Id.*). He was suing his former employer, waiting for unemployment compensation, and had an upcoming trip to Pennsylvania to see his father. (*Id.*).

On August 16, 2017, the plaintiff reported to Dr. Graham that he was starting a cashier job at Whole Foods, he recently visited his father and stepmother in Pennsylvania, and he was going to a paternal uncle's wedding. (Tr. 610-11, 727-28). At that time, Dr. Graham documented

improvement as the plaintiff's depression was mild and his sleep was better, but he continued to have flashbacks of his auto accident. (Tr. 610, 727).

The ALJ discounted Dr. Graham's repeated clinical assessment that the plaintiff had a decreased functioning ability and flashbacks, and instead, focused on the plaintiff's ability to spend time with his father and socialize with family. (Tr. 22).  Additionally, while the ALJ noted instances of improvement (*see* Tr. 22), he ignored the fact that the plaintiff's improvement did not last and that the record reflected limitations, symptoms, and a level of functioning consistent with the treating physician's opinions.

On September 13, 2017, the plaintiff presented to Dr. Graham with an increase in depression and insomnia, and he had suicidal ideation but no plan. (Tr. 600, 717). A week later, the plaintiff reported to Dr. Graham that he might get a cafeteria job at Stamford Hospital, that he would visit his father for four days in October and that he would see a Social Security psychiatrist. (Tr. 590, 709).  His anxiety was mild to moderate, his depression was moderate, his sleep improved, and had loss of pleasure and decreased functioning ability, as well as disturbing or unusual thoughts, feelings, and sensations. (*Id.*).  Again, rather than consider Dr. Graham's findings regarding the plaintiff decreased functioning ability, the ALJ noted that the plaintiff expressed interest in securing a cafeteria job.  Yet, Dr. Graham's assessment regarding the plaintiff's decreased level of functioning was consistent with the findings of a second disability examiner, Dr. Cohen, who, six months prior, on March 10, 2017, had performed a consultative examination of the plaintiff in connection with his application for benefits.  (Tr. 375-84).

As of March 10, 2017, the plaintiff's full-scale IQ was 86 with a processing speed composite score of 79, which was the eighth percentile. (Tr. 378). His overall IQ was in the low average range, and his processing speed was significantly impaired. (*Id.*).  He had weaknesses on

tasks of abstract concept formation and managing fluid reasoning and nonverbal tasks. (Tr. 380). His spatial reasoning and instructional tasks were weak and were related to the traumatic brain injury. (*Id.*). He demonstrated slight difficulty with attention disturbances and mild distractibility (Tr. 383). He had slowed psychomotor processing speed and slow cognitive processing. (Tr. 382). He had anxiety in interpersonal situations, low self-esteem, poor abstract reasoning, instructional weakness, fluid reasoning difficulties, and, at times, limited memory and recall. (Tr. 383).  His general attitude and behavior were cooperative and pleasant toward Dr. Cohen (Tr. 383), and he denied depression and reported social support from his AA group or his church group.  (Tr. 383).

Dr. Cohen assessed the plaintiff with major neurocognitive disorder due to traumatic brain injury, generalized anxiety disorder, alcohol abuse in remission, and personality traits of avoidant personality disorder. (Tr. 384).  His prognosis was "[g]ood[,]" and, if he "receive[d] rehabilitation assistance and possible assistance in trying to find additional employment[,] he might perform quite well."  (*Id.*).

The ALJ accepted Dr. Cohen's finding that the plaintiff had executive functioning limits after his traumatic brain injury, and that he was limited in his ability to interact with others.  (Tr. 21).  The ALJ assigned "great weight" to Dr. Cohen's examination report and credited his conclusion that the plaintiff could perform "quite well if he had help finding a job." (Tr. 21).[6] The ALJ, however, assigned "little weight" to Dr. Cohen's second opinion. (Tr. 21-22).

Dr. Cohen's second examination occurred on October 16, 2017. (Tr. 550-53).  At that time, the plaintiff reported that he was in treatment with Helen Collins at the Optimus Clinic in Stamford,

---

[6] The ALJ noted that, during his consultative examination, the plaintiff demonstrated an average ability to utilize language and process and to acquire new information, and, while he did show "great difficulty analyzing and solving problems that required three parts of a puzzle," he also had average range for short-term immediate attention and concentration. (Tr. 20).

and that he was seeing his psychiatrist, Dr. Graham. (Tr. 551). The plaintiff recounted that the day

prior, he was upset and walked out of his group therapy because he was resentful of what other

members were saying. (*Id.*).  He reported that he still had flashbacks to the accident during the

daytime, when he walked downtown, or went to an appointment. (*Id.*).  He tried to avoid the

daytime when high school students were outside; he was living near a high school and was afraid

of being around those students. (*Id.*).

   The plaintiff reported that he had not slept well that week because it was the week when

his accident had occurred.  (*Id.*). His mood was "very disrupted[,]" and he had been crying and

was anxious.  (*Id.*).  He relayed that he had been barred from an AA meeting when he had tried to

stand up for himself; he had become aggressive toward someone who had been giving him a hard

time. (*Id.*). He was despondent, had thoughts of suicidal ideation and exhibited self-destructive

behavior. (Tr. 552).  Dr. Cohen opined that the plaintiff's prognosis was "[g]uarded[.]" (Tr. 553).

He exhibited significant depression with suicidal ideation, and he was "remarkably withdrawn and

isolated and [felt] lonely."  (*Id.*).  Dr. Cohen found that the plaintiff demonstrated fatigue, poor

stamina, and poor inhibitory controls of his anger and aggression, and his mood appeared worse

than the previous examination.  (*Id.*).  Dr. Cohen's diagnostic impression was that the plaintiff had

major depression, recurrent, history of major neurocognitive disorder, PTSD, delayed, and alcohol

abuse, in remission. (*Id.*).

   The plaintiff reported that he attempted to work at Whole Foods, but could not last four

hours as a cashier because his knee hurt if he stood too long and, as confirmed by an aptitude test

from BRS, he was not "appropriate" for tasks requiring interpersonal contact with customers.  (Tr.

552).  Yet, the ALJ discounted this opinion, and the opinions of Dr. Graham because he found the

limitations they identified were unsupported by the record as the plaintiff had expressed interest

in working, securing a job and wanting to volunteer.  The ALJ, however, failed to acknowledge that this attempt at work failed because of the plaintiff's physical limitations, and because of his mental impairments which significantly limited his ability to interact with others. The ALJ found that Dr. Cohen's conclusion that the plaintiff was remarkably withdrawn and had poor impulse control contrasted with the treatment notes showing no compulsive behavior.  (Tr. 22). Additionally, the ALJ concluded that Dr. Cohen's notation that the plaintiff had a history of "attention weakness" was not supported by other medical records.  (Tr. 22). The ALJ's decision in this respect, however, is not supported by substantial evidence.

In the time between Dr. Cohen's first and second consultative examination, the plaintiff sought additional treatment for depression.  On April 4, 2017, he presented to the emergency room with depression and anxiety.  (Tr. 390).  A week later, he started behavioral health treatment with Helen Collins, LCSW. (Tr. 482-85).  He was assessed with episodic mood disorders. (Tr. 484). During his mental status examination on May 1, 2017, he was alert and oriented with normal speech, linear, goal-directed thoughts, intact attention, concentration and recall, fair remote memory, comfortable mood, congruent affect, poor appetite, restless sleep, average intelligence, good insight, good abstraction, independent functional capacity, and no delusions or hallucinations. (Tr. 502). The diagnostic impression at that time included unspecified mood disorder, unspecified alcohol related disorder in sustained remission, and "R/O" [rule out] mood disorder due to medical condition. (Tr. 502). A week later, he presented feeling the same with anxiety, depression, sleep disturbance, and loss of interest in activities.  (Tr. 498).

On May 12, 2017, the plaintiff underwent a psychiatric evaluation.  (Tr. 487-493, 515-21). He explained that, when he had been fired from his last job for getting into an altercation with his coworker, the interaction had reminded him of the bullying incident that had led to his traumatic

brain injury. (*Id.*).  The recent job experience had been overwhelming to him and he could not sleep; he had nightmares and was severely paranoid. (*Id.*).  He was agoraphobic and stayed away from the mall, and he exhibited PTSD symptoms. (*Id.*).  At that time, the diagnostic impressions included chronic PTSD, mood disorder due to traumatic brain injury with psychotic features, alcohol dependence and cannabis dependence in remission, and personality disorder traits. (Tr. 492, 520).

The plaintiff saw Collins on a weekly basis.  On May 15, 2017, the plaintiff exhibited anxiety, depression, sleep disturbance, loss of interest, and fair energy levels, and he reported difficulty with social interactions.  (Tr. 496).   A week later, he reported continued PTSD-like symptoms of hypervigilance when in public, when walking towards groups of adolescents, and, at times, when crossing the road.  (Tr. 494).  He reported vivid dreams and feeling scared from these dreams.  (*Id.*).  Over the course of treatment with Collins, he continued to have difficulty sleeping; he experienced vivid nightmares, and he discussed his social and interpersonal difficulties, as well as feelings of isolation.  (Tr. 612-47; *see also* Tr. 598, 602, 715, 719).

In July, the plaintiff reported to Collins that he struggled with anxiety, and he continued to have nightmares.  (Tr. 624-28).  On July 17, 2017, the plaintiff had a confrontation with another AA member, and the police were called.  (Tr. 622-23). This experience triggered more flashbacks from his accident.   (*Id.*).   He was no longer allowed to attend his AA meetings. (Tr. 614-18).  Collins noted that the plaintiff attempted to work at Whole Foods in August 2017, but he had too much pain in his knee and feet.  (Tr. 608, 725).

By September 2017, the plaintiff discussed his suicidal thoughts (Tr. 596, 713), and his attempt at suicide.  (Tr. 594, 711).   The plaintiff reported isolating himself (Tr. 592) and suicidal ideation on a constant basis despite attending a gym, AA meetings, visiting family, and attending

therapy. (Tr. 588). On October 17, 2017, he no longer felt suicidal, but continued to have difficulties with sleep, anxiety, depression, loss of interest in activities, and fair energy level and euphoria (Tr. 580-81, 705). A week later, he reported suicidal ideation and wanted to go to the hospital. (Tr. 578-79, 703). In November 2017, the plaintiff reported that he still had difficulties with sleep and nightmares. (Tr. 566-67, 572-74, 691-92, 701).

On November 14, 2017, Dr. Graham noted that the plaintiff was anxious and depressive, with a loss of pleasure, decreased functioning ability, listlessness, and disturbing or unusual thoughts, feelings, and sensations, including flashbacks. (Tr. 568-69, 570-71, 693-94, 697-98).

The ALJ did not reference the consistency of these records with the limitations articulated by Dr. Cohen. Moreover, the ALJ did not even reference Dr. Graham's third medical source statement in his decision. Although the defendant contends that this omission was harmless error, the Court disagrees. The ALJ rejected Dr. Graham's opinions on grounds that they lacked support. Yet, his medical opinions were consistent, and there was ample support for his assessments within his treatment records.

In his December 4, 2017 report, Dr. Graham opined that the plaintiff had a small reduction in his depression and flashbacks, although he continued to have flashbacks, and he continued to have trouble with his recent memory, attention, concentration. (Tr. 559). He had a depressive mood and constricted affect and fair judgment (Tr. 560). He had a frequent problem or limited ability to use appropriate coping skills, handle frustration appropriately, carry out multi-step instructions, focus long enough to finish simple tasks or activities, and persist in simple activities without interruption from psychological symptoms. (Tr. 561-62). Additionally, he "[s]ometimes" had a problem or "[r]educed ability" in carrying out single step instructions, changing from one simple task to another, and performing basic activities at a reasonable pace. (Tr. 561). His

depression and flashbacks impaired his ability to carry out instructions and complete tasks and impaired his coping skills and frustration tolerance.  (Tr. 561-62).

Dr. Graham's December 2017 treatment records reflected improvement in that the plaintiff's anxiety and depression were mild, but he continued to have disturbing or unusual thoughts, feelings, and sensations, as well as flashbacks of his accident. (Tr. 564, 689).  On December 25, 2017, however, the plaintiff presented to the emergency department with suicidal ideation and no plan.  (Tr. 656-63). The next day, he presented to Dr. Graham with auditory hallucinations.  (Tr. 683).[7]

In assigning "little weight" to two of Dr. Graham's opinions, and not referencing the third opinion at all, the ALJ failed to discuss Dr. Graham's treatment records, which included multiple entries consistent with his medical assessments.  Additionally, the ALJ failed to discuss the consistency in Dr. Cohen's assessments with the entries in Dr. Graham's treatment records.  Similarly, his opinions were consistent with the findings of the State agency reviewers, who noted the plaintiff's off-task behavior and reduced concentration and pace.[8] The ALJ assigned "partial

---

[7] The remaining treatment records reflect that in January 2018, the plaintiff reported continued flashbacks, but his mood improved.  (673-80).  When he saw Dr. Graham on February 7, 2018, the plaintiff denied symptoms of anxiety, depression or sleeplessness.  (Tr. 669-70).  A week later, he reported to Collins that he had not heard about any jobs following interviews. (Tr. 665).  He continued to present with depression, anxiety and sleep disturbance.  (*Id.*).

[8] Specifically, on March 23, 2017, State agency reviewer Dr. Janine Swanson Psy.D., opined that the plaintiff had moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for an extended period, complete a normal workday or workweek, respond appropriately to changes in the work setting, or set realistic goals or make plans independently of others. (Tr. 74-75).  Dr. Swanson stated that the plaintiff was able to attend to simple tasks for two hours at a time, but due to his cognitive limits and anxiety symptoms, he would not be able to sustain concentration on complex tasks for more than a brief period. (Tr. 74).  Additionally, his "cognitive slowing" would "make it difficult" for the plaintiff to work in a fast paced, competitive environment.  (Tr. 74). He was suited for "simple, routine, repetitive tasks in a setting that [did] not require strict adherence to time or production quotas."  (Tr. 74).

Similarly, on October 31, 2017, Dr. Katrin Carlson, Psy.D. completed a Psychiatric Review Technique on behalf of the State agency.  (Tr. 89-90).  She opined that the plaintiff could consistently recall very simple instructions but may "occasionally struggle to recall more detailed instructions."  (Tr. 94).  He could perform very simple routine repetitive tasks for at least two hours at a time in a setting without strict time or productivity expectations. (*Id.*).  He was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without

weight" to these opinions, but only to the extent that the plaintiff would not have "productivity expectations." (Tr. 22).

"The ALJ is not permitted to cherry pick from the treatment record only evidence that is inconsistent with the treating source's opinion in order to conclude that the opinion should be accorded less weight." *Quinto v. Berryhill*, No. 3:17-CV-00024 (JCH), 2017 WL 6017931, at *14 (D. Conn. Dec. 1, 2017) (citing *Ortiz v. Colvin*, No. 3:15-CV-00956 (SALM), 2016 WL 4005605, at *6 (D. Conn. July 26, 2016)). Moreover, the Second Circuit has explained that it "is of heightened importance" in the context of mental health impairments that an ALJ make an "attempt to 'reconcile' or 'grapple with' the apparent longitudinal inconsistencies in . . . mental health [records.]" *Estrella*, 925 F.3d at 97; *see Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."). Accordingly, because 'a searching review of the record" has not "assure[d]" the Court 'that the substance of the treating physician rule was not traversed," *Estrella*, 925 F.3d at 96, the Court must remand to this case to the ALJ. *See also Quinto*, 2017 WL 6017931, at *14 (holding that the "ALJ is not permitted to cherry pick from the treatment record only evidence that is inconsistent with the treating source's opinion in order to conclude that the opinion should be

---

interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 93-94). Additionally, he was moderately limited in his ability to interact with the general public, get along with coworkers and peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting and set realistic goals or make plans independently of others. (Tr. 95). He could respond to basic changes but would have difficulty with frequent changes due to slowed processing speed and lower frustration tolerance. (Tr. 95). He may have needed some additional assistance when initially setting work goals but then could carry out his work goals independently. (Tr. 95). Dr. Carlson further opined that the plaintiff would not be well-suited for jobs that required frequent interaction with the public or work on a collaborative team, but would be capable of occasional interactions with coworkers for task purposes and would be able to respond to supervision and would maintain a neat appearance. (Tr. 95).

accorded less weight.") (citing *Ortiz v. Colvin*, No. 3:15-CV-00956 (SALM), 2016 WL 4005605, at *6 (D. Conn. July 26, 2016); *see also Ardito v. Barnhart*, No. 3:04–CV–1633(MRK), 2006 WL 1662890, at *5 (D. Conn. May 25, 2006) (holding that the ALJ erred when he "cherry-picked out of the record those aspects of the physicians' reports that favored his preferred conclusion and ignored all unfavorable aspects, without explaining his choices, let alone basing them on evidence in the record.").

Although the plaintiff's brief identifies additional challenges to the ALJ's decision, the Court need not address them given that the "case must return to the agency either way for the reasons already given, [so] the Commissioner will have the opportunity on reman to obviate th[ese] dispute[s] altogether by" addressing the remaining arguments on remand. *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 94 (2d Cir. 2019).

VI.   <u>CONCLUSION</u>

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is GRANTED such that this case is remanded for additional proceedings consistent with this Ruling, and the defendant's Motion to Affirm (Doc. No. 14) is DENIED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 4th day of May, 2020 at New Haven, Connecticut.

   _/s/Robert M. Spector, USMJ
   Robert M. Spector
   United States Magistrate Judge